# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### CASE NO. _____

RACHEL PATTERSON,

  Plaintiff,

  v.

THE MICHAELS ORGANIZATION, LLC,
AMC East Communities, LLC, and MMS Air
Force, LLC,

  Defendants.

_____/

## COMPLAINT

Plaintiff Rachel Patterson, the spouse of an active-duty soldier in the U.S. Army stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), lived with her family in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiff's housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of her residence. Moreover, Defendants concealed these conditions from Plaintiff through false and misleading statements and the failure to disclose known hazards, and, when the conditions were reported, failed to properly repair and remediate them. Plaintiff brings

this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1. Plaintiff RACHEL PATTERSON resided at MacDill Air Force Base in Tampa, Florida at all times relevant to this Complaint. Ms. Patterson is the spouse of an active-duty soldier in the U.S. Army and resided in the home with her family, including her minor child, F.P.

2. Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3. Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. AMC is listed as the "Owner" on the lease signed by the Plaintiff.

4. Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5. Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and maintenance activities relating to military housing at MacDill. It presents itself as the landlord, appearing as the "Landlord/Lessor" on Mold Addenda, even though

2

Defendant AMC is the owner or the lessor on the leases. Harbor Bay is listed as the Community Manager and Property Manager on Plaintiff's lease—identified as the successor in interest to Michaels Management Services, Inc.—and, upon information and belief, on the lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6.      In related litigation, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiff alleges the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiff's claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive legislative jurisdiction in 1950. Plaintiff is aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiff's claims occurred on an exclusive federal enclave, Plaintiff's claims are governed by federal law under the Federal Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952).

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiff's claims occurred within this District on the federal enclave at MacDill where Plaintiff was exposed to the conditions at issue.

9. This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2), 48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10. In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11. Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled. In addition, MHPI contractors typically receive performance incentive fees,

payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12.　In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13.　Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

### MHPI Housing at MacDill

14.　In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels, either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15.    Plaintiff paid her BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16.    Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

### Defendants' Joint and Integrated Approach to MacDill Housing

17.    Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18.    With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19.    The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20.     Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at MacDill.

### The Unsafe and Unhealthy Housing Conditions at MacDill

21.     Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22.     For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or con-tained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23.     Harbor Bay refused to follow its mold policies, despite knowing that fail-ure to do so would lead to the growth of toxic mold.

### Rachel Patterson

24.     Rachel Patterson, the spouse of an active-duty Soldier in the U.S. Army, resided at 1713 Billy Mitchell Loop, MacDill with her family beginning on or about July 2, 2024, until they vacated the residence in October 2025.

25.     Ms. Patterson's spouse entered into a lease with Defendants prior to mov-ing into the home. The lease listed AMC as the "Owner" and Harbor Bay at MacDill—the successor in interest to Michaels Management Services, Inc.—as the "Community

Manager" and "Property Manager," and provided that Florida law governed the lease.

26. Before move-in, Harbor Bay provided Ms. Patterson with a seven-year maintenance history. That history did not reflect, and on information and belief should have reflected, the dangerous and unstable flooring in an upstairs bedroom.

27. Although Ms. Patterson received the seven-year maintenance history, Defendants required her spouse to sign the lease before conducting the walkthrough and inspection of the home. The walkthrough occurred on the same day the Pattersons' furniture and belongings were delivered by military-hired movers and consequently was rushed. The Patterson family reviewed the maintenance history and assumed that all of the prior issues were repaired. They did not believe that Harbor Bay would simply "inspect" an active leak or reports of mold in the bathroom ceiling instead of repairing those problems, which is what the maintenance history suggested. Yet that is precisely what happened. The maintenance history did not mention any unstable or soft flooring in an upstairs bedroom. Had Ms. Patterson or her spouse known the true condition of the residence, including unresolved water intrusion, HVAC and mold issues, and dangerous and unstable flooring in the upstairs bedroom, they would not have signed the lease or agreed to occupy the home. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

28. Plaintiff's lease represented that, prior to moving in, the home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion.

29. Ms. Patterson is an intended third-party beneficiary of the lease for her home at MacDill.

30. During the tenancy, Ms. Patterson observed, came into direct contact with, inhaled, and ingested mold, and was exposed to elevated interior moisture and repeated water intrusion within the home.

31. After taking possession of the residence, Ms. Patterson discovered visible water damage on the garage ceiling. When she asked Harbor Bay to repair it, she was told that Harbor Bay was still waiting for a roofing company to assess the leak. The stain darkened over time, and the garage leak was not repaired for over six months.

32. After moving in, Ms. Patterson also discovered that the flooring in an upstairs bedroom was soft and felt unstable. When she complained, Harbor Bay advised that a flooring contractor would inspect it. When Elite Flooring, Harbor Bay's contractor, inspected the bedroom, it told Ms. Patterson that the floor was "fine."

33. When Ms. Patterson continued to express concern and asked for a reinspection, a Harbor Bay representative identified as "Louis" arrived. The full name of this representative, as well as the exact date on which he inspected the Patterson home, is known to, and within the possession, custody, and control of, Defendants. When Ms. Patterson pointed out divots in the floor and noted that the wood felt soft, Louis told her the soft floors were "normal in Florida" and that he "saw bowed floors all the time," or words to that effect. When Ms. Patterson asked whether it was safe to keep a bed in the upstairs room, Louis responded that he "wouldn't put heavy furniture in the room or do jumping jacks in it," or words to that effect. As a result, no one in the

family slept in that room for the remainder of the tenancy, out of fear that the floor was not safe, limiting the Pattersons' use of their home.

34.    Harbor Bay did not offer to have the soft upstairs floor inspected as part of any repair until October 2025, after a contractor, Clearity Environmental, determined that the home required extensive mold remediation. The upstairs floor was never repaired during Ms. Patterson's tenancy.

35.    On August 8, 2024, approximately one month after moving into the home, Ms. Patterson reported water seeping through the tile flooring in the downstairs bathroom, which shared a wall with the outdoor utility closet containing the family's HVAC. A Harbor Bay technician came to the home, unlocked the adjacent outdoor utility closet, and identified a clogged air-conditioning drain line in the utility closet as the source of the water. The area in the utility closet had become so damp that mosquitoes were present, which the technician attempted to kill with a handheld blowtorch. After clearing the drain line, the technician left the outdoor utility closet open to dry. The identity of this unnamed maintenance technician is known to, and within the possession, custody, and control of, Defendants.

36.    The next day, a musty odor emanated from the downstairs bathroom. When Ms. Patterson later noticed mold forming on the utility closet door located outside the home, and mosquitoes again emerging from it, she reported the condition to Harbor Bay, which said it would inspect the utility closet again. That inspection did not occur. The musty smell persisted in the downstairs bathroom.

37.    On September 18, 2024, Ms. Patterson discovered a new water spot

10

developing on the downstairs bathroom ceiling and reported the condition to a Harbor Bay representative identified as Julia, who arranged an inspection and a remediation order. Nothing happened for weeks.

38.    On or about October 3, 2024, a contractor retained by Harbor Bay finally addressed the water spot in the downstairs bathroom. The contractor sealed the bathroom with plastic sheeting and red containment tape, removed the bathroom door, tore down the ceiling, laid down "Ram Board" floor paper from the front door to the downstairs bathroom, and placed fans and dehumidifiers in the bathroom.

39.    On or about October 5, 2024, the family evacuated because of Hurricane Milton. As they were getting into their car to evacuate, the Pattersons observed workers removing the fans and dehumidifiers from their residence without notice. When Ms. Patterson returned from the evacuation, the bathroom remained unusable, sealed with plastic and tape, without a door, and with a hole in the ceiling. The fans and dehumidifiers were never replaced, and the room sat vacant with an open ceiling and walls.

40.    The containment measures were ineffective. The plastic sheeting and tape repeatedly failed and had to be reapplied by Ms. Patterson herself. Upon information and belief, this lack of effective containment, coupled with the open ceiling, spread mold throughout the home and exposed the family to mold.

41.    After returning from the evacuation, Ms. Patterson sought status updates on her bathroom on October 18, October 22, and October 25, 2024. Harbor Bay personnel, including a representative identified as "Jeb" and a maintenance representative

11

identified as "Meg," told her that "all work was on hold and that nothing would be scheduled for at least another two weeks," or words to that effect. When Ms. Patterson asked whether she could remove the "Ram Board" installed by the workers which covered the floor outside the unrepaired bathroom so she could clean the home, Meg told her to "do what [she] needed to do" and that it "shouldn't be a problem," and advised her to document the condition with photographs. The full names of these representatives are known to, and within the possession, custody, and control of, Defendants.

42.    In mid-to-late November 2024, after receiving no meaningful response from Harbor Bay regarding the still unrepaired bathroom, Ms. Patterson discussed the unresolved repairs with a neighbor. On his own accord, that neighbor's husband informed the Base Commander of the unresolved repair issues. Only after the Base Commander became involved did Harbor Bay respond and connect Ms. Patterson with its Environmental Supervisor, Mike Whitman.

43.    On December 3, 2024, Mr. Whitman confirmed by email that a contractor would arrive to repair the bathroom ceiling duct and perform sheetrock repairs, and represented that he was reviewing additional unresolved maintenance requests, including the leak in the garage ceiling. Despite Mr. Whitman's assurance that contractors would arrive and conduct repairs, the scheduled contractors repeatedly failed to appear. After further complaints, Harbor Bay eventually replaced the ceiling drywall in the garage that had been damaged by the leak in mid-December. Unknown technicians cut out the impacted drywall and left a hole in the garage ceiling open for days

before taping plastic sheeting over the hole.

44.    When Mr. Whitman personally inspected the residence on December 16, 2024, the bathroom still contained construction dust, paint overspray, and blood stains left behind after a contractor injured his hand during the earlier work. During this inspection, Ms. Patterson again expressed concern over the upstairs flooring. Mike Whitman told Ms. Patterson that "those floors were inspected and they were good."

45.    On or about December 18, 2024—after Ms. Patterson called to remind Harbor Bay that the work still needed to be done—Harbor Bay personnel arrived late in the day, told Ms. Patterson that the work had been completed, and represented that both the air-conditioning duct and the ceiling had been repaired; a small crew then cleaned the area. The full name of the representative who claimed that the work had been completed, as well as the exact date on which he made the statement, is known to, and within the possession, custody, and control of, Defendants. When Mr. Whitman re-inspected the bathroom afterward, he concluded that it required further cleaning because Ms. Patterson still detected a musty odor, and a crew returned to bleach-clean the remaining dust and re-mop the floor.

46.    The problems continued into 2025. During a heat wave in July 2025, the HVAC system failed and remained unrepaired for several days. When Ms. Patterson sought assistance, Harbor Bay maintenance personnel dismissed her concerns, telling her that it was simply hot outside and suggesting that she step outdoors to confirm that the temperature inside the home was cooler. The full name of this representative is known to, and within the possession, custody, and control of, Defendants. After that

13

response, Ms. Patterson called again several days later to report that the home still would not cool. An air-conditioning company ultimately replaced large parts of the AC unit. During these repairs, Harbor Bay advised Ms. Patterson that it would clean the exterior of the AC unit and the utility closet because of mold growth on the unit and inside the closet. The Harbor Bay maintenance technicians closed and locked the utility closet door when they left, so Ms. Patterson was unable to determine what, if anything, was done inside the closet.

47.　In late August 2025, water staining and mold returned to the downstairs bathroom ceiling in the same location as the 2024 intrusion. Ms. Patterson reported it on August 27, 2025. When Harbor Bay reinspected on August 28, 2025, its representative attributed the condition to "excessive moisture from the AC duct"—the same cause identified in 2024—and stated that a remediation team would be sent. No one followed up. The full name of this representative is known to, and within the possession, custody, and control of, Defendants.

48.　In September 2025, Ms. Patterson discovered visible mold inside the kitchen range hood; when Harbor Bay responded, a maintenance technician offered only to wipe the visible growth away with a rag. The full name of this representative, as well as the exact date on which he inspected the Patterson home, is known to, and within the possession, custody, and control of, Defendants.

49.　On September 18, 2025, Clearity Environmental ("Clearity") evaluated the residence. Mr. Whitman provided Ms. Patterson with the resulting Clearity report on October 8, 2025. When the parties reviewed the report on October 13, 2025,

14

Ms. Patterson was advised that the recommended repairs would displace the family from the home for approximately two weeks, or longer, and the home, along with all of their possessions, would be inaccessible during that time. This would have delayed the family's permanent-change-of-station move for months, impacting their child's education and their ability to find suitable housing in their new duty location. The Pattersons felt they had no meaningful choice but to agree to defer any repairs and none were performed before they vacated.

50. The Patterson family vacated the home in late October, and no repairs were conducted before the family left. Ms. Patterson eventually learned from her former neighbor that their MacDill home later underwent significant demolition and repairs after they vacated the home, to include the removal of windows and a large amount of lumber.

51. In connection with the move-out on or about October 25, 2025, Harbor Bay charged Ms. Patterson for additional days because the departure occurred on a weekend—a charge Harbor Bay had not disclosed to her in advance—and, despite her repeated follow-up, the disputed move-out refund remains outstanding.

52. Throughout the tenancy, Ms. Patterson and her family were forced to live with persistent moisture, pests, dangerous floors, and mold, including recurring mold in the downstairs bathroom, that Defendants repeatedly failed to adequately investigate or remediate. The assignment was expected to be a lower-stress posting, but the home's unremedied conditions and unfulfilled repair promises instead became a significant and ongoing source of stress. As a direct and proximate result of

Defendants' acts and omissions, Ms. Patterson suffered significant emotional distress and economic harm: she felt dismissed and disregarded, experienced strain on her personal relationships and marriage, incurred out-of-pocket losses including the disputed move-out charges, and endured ongoing stress.

53.     Notwithstanding MacDill's status as a federal enclave, those of Plaintiff's claims that seek recovery for personal injuries (including emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law. Contemporary Florida law also governs Plaintiff's claims because all of those claims arise out of Plaintiff's injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiff leased from Defendants, and Plaintiff's lease contains a choice of law provision selecting contemporary Florida law.

## COUNT I: Breach of Contract
### (against Defendant AMC)

54.     Plaintiff incorporates the allegations set forth in paragraphs 1–53.

55.     Plaintiff, through her service member spouse, had a valid lease with AMC. Ms. Patterson is an intended third-party beneficiary of the lease for her home at MacDill. AMC owed contractual obligations to Plaintiff to provide and maintain habitable housing and to remedy leaks, moisture, mold, and other issues. Plaintiff and her spouse have complied with all obligations under the lease.

56.     AMC failed to comply with the material terms of the lease by failing to ensure Plaintiff's home was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

16

57. As direct and foreseeable results of AMC's breaches, Plaintiff suffered emotional distress and economic harm, out-of-pocket losses, the disputed move-out charges, and attorneys' fees and costs.

### COUNT II: Negligence
### (against all Defendants)

58. Plaintiff incorporates the allegations set forth in paragraphs 1–53.

59. Defendants owed a duty to Plaintiff to exercise reasonable care in the operation, management, maintenance, and repair of her home. Defendants negligently failed to meet the standard of care in performing those duties.

60. As the property owner and lessor of Plaintiff's home, AMC owed Plaintiff a duty to maintain her home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

61. As property manager for Plaintiff's MacDill home, Defendants owed a duty to Plaintiff to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiff to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

62. Defendants' acts and omissions in performance of their duties as Plaintiff's lessors, landlords, and property managers fell far below the standard of care owed

17

to Plaintiff under Florida law.

63.     Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiff by failing to ensure that Plaintiff's home was safe and fit for habitation.

64.     Defendants breached the duty to exercise ordinary care in multiple respects, including: (a) failure to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failure to reasonably repair and remediate issues related to mold, moisture, and water leaks; (c) failure to adequately respond to Ms. Patterson's complaints regarding unsafe conditions in her home; (d) failure to implement appropriate safety protocols to protect residents from toxic mold; (e) dismissing and failing to investigate the soft, unstable upstairs flooring, including by representing that it was "fine" and "normal in Florida"; (f) applying only ineffective containment to the downstairs bathroom and failing to replace the fans and dehumidifiers, allowing mold to spread through the home; (g) performing only cosmetic measures, such as wiping visible mold with a rag, without investigating or remediating the underlying conditions; and (h) misrepresenting to Ms. Patterson that conditions had been or would be addressed when the underlying problems remained unaddressed.

65.     Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

66.     Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiff's home.

18

67.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered financial harm and severe emotional distress.

## COUNT III: Gross Negligence
### (against all Defendants)

68.    Plaintiff incorporates the allegations set forth in paragraphs 1–53.

69.    Defendants owed a duty to Plaintiff to exercise reasonable care in the operation, management, maintenance, and repair of her home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

70.    As the owner and lessor of Plaintiff's home, AMC owed Plaintiff a duty to maintain Plaintiff's home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

71.    As property manager for Plaintiff's home, Defendants owed a duty to Plaintiff to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiff to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

72.    Defendants were aware that circumstances in Plaintiff's home

19

constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

73. Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiff, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) failure to remediate defects that would cause moisture intrusion and microbial growth; (b) failure to reasonably repair and remediate complaints of water leaks and mold; (c) failure to implement appropriate safety protocols to protect residents from toxic mold; (d) failure to adequately respond to Ms. Patterson's complaints regarding unsafe conditions in her home; (e) dismissing the soft, unstable upstairs flooring as "normal in Florida" and never repairing it during the Pattersons' tenancy; (f) leaving the downstairs bathroom open and unremediated for months after removing the drying equipment; (g) performing only cosmetic measures such as wiping visible mold with a rag; (h) misrepresenting to Ms. Patterson that conditions had been or would be addressed; and (i) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

74. Each of the Defendants' acts of reckless indifference to the Plaintiff's rights is equivalent to an intentional violation of them.

75. As a direct and proximate result of Defendants' gross negligence, Plaintiff suffered financial harm and severe emotional distress.

**COUNT IV: Omitted**

**COUNT V: Negligent Infliction of Emotional Distress**
**(against all Defendants)**

76.     Plaintiff incorporates the allegations set forth in paragraphs 1–53.

77.     By their acts and omissions, Defendants caused Plaintiff to be exposed to and come into direct physical contact with, and ingest and/or inhale mold  as well as be exposed to  mold-contaminated conditions within her home.

78.     As a result of that exposure and contact, and of Defendants' conduct, Plaintiff suffered severe emotional distress.

79.     Plaintiff experienced ongoing anxiety, worry, and distress arising from the conditions in her home and Defendants' handling of them.

80.     Plaintiff's emotional distress arises directly from Defendants' conduct in exposing her to, and failing to remediate, the moisture and mold conditions within her home.

81.     Defendants knew or should have known that Plaintiff's home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would likely result in physical harm to Plaintiff.

82.     Plaintiff suffered severe emotional distress as a result of that unhealthy and dangerous exposure.

83.     Defendants are liable for the consequences that they knew or should have known would occur because of their negligent conduct.

84.     Plaintiff has suffered, is suffering, and will continue to suffer severe

emotional distress and associated harms because of Defendants' acts and omissions.

## COUNT VI: Intentional Infliction of Emotional Distress
### (against all Defendants)

85. Plaintiff incorporates the allegations set forth in paragraphs 1–53.

86. Defendants intentionally and knowingly subjected Plaintiff to housing conditions that were unsafe and unhealthy.

87. Defendants also recklessly misled Plaintiff into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiff into remaining in her home by falsely claiming that they would eliminate those dangers.

88. This intentional conduct, which subjected Plaintiff to risk of serious injury or illness over a prolonged period, was extreme and outrageous.

89. Intentionally subjecting the Plaintiff to such dangerous conditions and taking actions to ensure her continued exposure is beyond all possible bounds of decency and intolerable in a civilized community.

90. This conduct caused Ms. Patterson severe emotional distress as she was repeatedly dismissed and disregarded, forced to live for months with an open, unusable bathroom and mold spreading through her home, and left to reapply failed containment herself.

91. Plaintiff suffered severe emotional distress due to Defendants' extreme and outrageous conduct.

### COUNT VII: Breach of the Warranty of Habitability
### (against Defendant AMC)

92.    Plaintiff incorporates the allegations set forth in paragraphs 1–53.

93.    AMC breached express and implied warranties of habitability.

94.    AMC owed Plaintiff a duty to provide her with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiff's home. AMC failed to meet the standard of care in performing those duties. In her lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

95.    AMC failed to live up to its duty to inspect the Plaintiff's home prior to her moving in, in order to make necessary repairs, and to transfer her family to a reasonably safe home.

96.    After Plaintiff moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The moisture, mold, pests, and unstable upstairs flooring in Plaintiff's home were dangerous conditions that AMC should have remediated.

97.    As a result of AMC's breach of the express and implied warranties of habitability, Plaintiff suffered emotional distress and other financial harm, including out-of-pocket losses and the disputed move-out charges.

### COUNT VIII: Third-Party Beneficiary Contract
### (against all Defendants)

98.    Plaintiff incorporates the allegations set forth in paragraphs 1–53.

99.    Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members and their families.

100.    The Operating Agreement originally entered into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiff was an intended beneficiary of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

101.    On information and belief, the Ground Lease, entered into by the Air Force and AMC, also contains language indicating that Plaintiff was an intended beneficiary.

102.    On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiff was an intended beneficiary of those agreements.

103.    Defendants and the Air Force intended to benefit the service members and their families living at MacDill. Ms. Patterson, as the spouse of an active-duty, senior enlisted soldier in the U.S. Army, resided at MacDill as an intended beneficiary. The obligations to provide these benefits were included in the underlying contracts to ensure that military families, including Plaintiff, would be provided with safe and habitable housing.

104.    Defendants breached the requirements of the underlying contracts by

24

failing to provide suitable management, maintenance, operations, and renovations of Plaintiff's home.

105.  Defendants also breached the duty of good faith and fair dealing implied in the contracts.

106.  As a foreseeable result of the Defendants' breaches of the contracts, Plaintiff, who is an intended, direct, third-party beneficiary of such contracts, sustained damages.

**COUNT IX: Negligence Per Se**
**(against all Defendants)**

107.  Plaintiff incorporates the allegations set forth in paragraphs 1–53.

108.  Defendants owed Plaintiff a duty to take steps to protect her from the specific injuries outlined in this Complaint.

109.  This duty was created by statutes specifically intended to protect Plaintiff from those harms.

110.  For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

  a)  "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." Tampa Code of Ordinances § 19-231(17);

25

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* § 19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

111. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

112. Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

113.   Additionally, Florida has a statutory framework regulating mold-related services in order to protect Plaintiff from the injuries described above. FLA. STAT. § 468.84 *et seq*.

114.   The Florida legislature determined that this statutory framework is "necessary in the interest of the public safety and welfare, to prevent damage to real and personal property, to avert economic injury to the residents of this state, and to regulate persons and companies that hold themselves out to the public as qualified to perform mold-related services." *Id.* § 468.84.

115.   Defendants failed to comply with the following statutory requirements:

   a) "A person may not … perform or offer to perform any mold assessment unless the mold assessor has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(1)(a);

   b) "A person may not … perform or offer to perform any mold remediation to a structure on which the mold assessor or the mold assessor's company provided a mold assessment within the last 12 months." *Id.* § 468.8419(1)(d);

   c) "A person may not … accept an engagement to make an omission of the assessment or conduct an assessment in which the assessment itself, or the fee payable for the assessment, is contingent upon the conclusions of the assessment." *Id.* § 468.8419(1)(h);

   d) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest

27

in a company employing a mold remediator may not …perform or offer to perform any mold remediation unless the remediator has documented training in water, mold, and respiratory protection under § 468.8414(2)." *Id.* § 468.8419(2)(a);

e) "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …perform or offer to perform any mold assessment to a structure on which the mold reme-diator or the mold remediator's company provided a mold remediation within the last 12 months." *Id.* § 468.8419(2)(d).

116.    Plaintiff is a member of the class that each of the above statutes were designed to protect.

117.    The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiff and described in this Complaint.

118.    Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01 and any other applicable statutes, codes, and regulations governing the habitability of res-idential housing and the health and safety of occupants.

119.    The violations of these statutes constitute negligence per se and were a proximate cause of Plaintiff's harm.

28

## COUNT X: Omitted

## COUNT XI: Unjust Enrichment
### (against Defendant AMC)

120.    Plaintiff incorporates the allegations set forth in paragraphs 1–53.

121.    Plaintiff conferred a benefit on AMC in the form of rent at the amount of the servicemember's BAH rate that the military transferred on her behalf. These funds were paid to AMC in return for safe and habitable housing.

122.    AMC failed to provide Ms. Patterson with a safe and habitable home; it failed to timely and adequately remediate the recurring moisture, mold, and structural conditions; and it charged her for additional days upon move-out without prior disclosure while failing to refund amounts owed. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiff.

123.    Plaintiff is entitled to restitution of some or all of the rent funds paid to AMC.

## COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act
### (FDUTPA) (Unfair Conduct)
### (against all Defendants)

124.    Plaintiff incorporates the allegations set forth in paragraphs 1–53.

125.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

126.    At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and

by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

127. At all relevant times, Plaintiff was a consumer within the meaning of the FDUTPA. *Id.*

128. Defendants' practices relating to Plaintiff's housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

129. On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

130. Defendants' acts and practices exposed Plaintiff to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

131. Given those unconscionable conditions, Plaintiff's interests in her MacDill home were only worth a small fraction of the rental payments for that home.

132. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

133. As a result of Defendants' unfair and unconscionable acts or practices, Plaintiff suffered losses and is entitled to recover actual damages, attorneys' fees, and

court costs. FLA. STAT.§ 501.211.

### COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct) (against all Defendants)

134.   Plaintiff incorporates the allegations set forth in paragraphs 1–53.

135.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

136.   At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, see *id., e.g.*, § 501.203.

137.   At all relevant times, Plaintiff was a consumer within the meaning of the FDUTPA, *see id.*

138.   Defendants' practices relating to Plaintiff's housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

139.   On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiff, engaged in deceptive acts and practices, including the following:

   (a) Defendants concealed facts and made deceptive assurances that caused Plaintiff's spouse to sign a lease that he never would have signed

31

had he known the truth;

(b) Defendants made false, misleading, and/or deceptive representations that Plaintiff's MacDill home was in habitable condition and thus far more valuable than it was in reality;

(c) in the lease between Defendants and Plaintiff's spouse, Defendants falsely warranted that Plaintiff's housing was safe, habitable, and free from defects;

(d) Defendants failed to disclose information that they knew about the condition of Plaintiff's housing with the intention of inducing Plaintiff's spouse into leasing the home at a cost beyond what it was actually worth;

(e) once Plaintiff discovered the unsafe and hazardous conditions in her home, Defendants falsely claimed that they would mitigate or fix those problems;

(f) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords; and

(g) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

140. As a few examples, Defendants (a) represented in the lease that the home was safe, clean, and habitable and their maintenance employee, "Louis," stated that the soft, unstable upstairs floor was "fine" and "normal in Florida," leading to it never being repaired; and (b) represented, on August 28, 2025, that the recurring bathroom

mold was merely "excessive moisture from the AC duct," and that a remediation team would be sent, when none followed.

141.    Plaintiff paid far more in rent than her home was actually worth.

142.    Due to their role in the leasing and/or management and maintenance of the Plaintiff's home at MacDill, Defendants were uniquely aware of the condition of Plaintiff's home, maintenance history, defects in design, the need for repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

143.    As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiff suffered losses and is entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

## COUNT XIV: Omitted

### COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions
### (against all Defendants)

144.    Plaintiff incorporates the allegations set forth in paragraphs 1–53.

145.    Once Plaintiff discovered the unsafe and hazardous conditions in her home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiff to remain in her home.

146.    Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, were innocuous or easily fixed conditions. Defendants knew or should have known that this was untrue.

147.    Defendants falsely told Plaintiff that the bowed and soft floors in her upstairs bedroom were "normal in Florida" and "fine," yet cautioned her to limit the

weight placed on the floors, indicating Defendants knew or should have known they were unsafe.

148.   When Plaintiff requested that Defendants repair unsafe and hazardous conditions in her home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

149.   On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

150.   Defendants intended to convince Plaintiff to remain in her home or agree to continue her occupancy based on these false representations.

151.   As a few examples, Defendants falsely (a) represented, through a Harbor Bay representative identified as "Louis," that the soft and unstable upstairs flooring was "fine" and "normal in Florida" and that Ms. Patterson need only avoid "heavy furniture" or "jumping jacks" in the room, when the floor was in fact unstable and was never repaired; (b) represented, on August 28, 2025, that the recurring downstairs-bathroom water staining and mold were merely "excessive moisture from the AC duct"—the same cause identified in 2024—and that a remediation team would be sent, when no remediation followed; and (c) represented that repairs were being handled while telling Ms. Patterson on October 18, 22, and 25, 2024 that "all work was on hold," applying only ineffective containment that repeatedly failed, and performing

cosmetic measures such as wiping visible mold from the kitchen range hood with a rag, rather than remediating the underlying conditions.

152. Defendants knew or should have known that these statements would be material to the Plaintiff's decisions whether to remain in her home.

153. Plaintiff justifiably relied on Defendants' assurances that they would take or had taken steps to make her home safe.

154. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff suffered emotional distress and economic harm, including out-of-pocket losses and the disputed move-out charges.

### COUNT XVI: Omitted

### COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)

155. Plaintiff incorporates the allegations set forth in paragraphs 1–53.

156. Defendants deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiff's housing, in order to cause Plaintiff to remain in her home notwithstanding the unsanitary and dangerous conditions in it.

157. Defendants made false statements to Plaintiff that her home was suitable for habitation throughout the course of Plaintiff's residence in the home.

158. Once Plaintiff discovered the unsafe and hazardous conditions in her home, Defendants consistently, deliberately, and falsely downplayed the severity of those problems. Defendants knew the true severity of those conditions, having

themselves inspected and performed repair work at the home.

159. When Plaintiff persisted in demanding that Defendants repair unsafe and hazardous conditions in her home, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants knew that they would never do so, as demonstrated by their repeated pattern of performing only cosmetic or temporary repairs, such as wiping visible mold, instead of addressing the underlying HVAC issues, structural defects, and elevated interior moisture.

160. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when Defendants knew, from their own technicians' prior visits to the home, that they had not adequately done so.

161. As a few examples, Defendants falsely (a) represented, through a Harbor Bay representative identified as "Louis," that the soft and unstable upstairs flooring was "fine" and "normal in Florida" and that Ms. Patterson need only avoid "heavy furniture" or "jumping jacks" in the room, when the floor was in fact unstable and was never repaired; (b) represented, on August 28, 2025, that the recurring downstairs-bathroom water staining and mold were merely "excessive moisture from the AC duct"—the same cause identified in 2024—and that a remediation team would be sent, when no remediation followed; and (c) represented that repairs were being handled while telling Ms. Patterson on October 18, 22, and 25, 2024 that "all work was on hold," applying only ineffective containment that repeatedly failed, and performing cosmetic measures such as wiping visible mold from the kitchen range hood with a rag, rather than remediating the underlying conditions.

162. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

163. Plaintiff justifiably relied on Defendants' assurances that they would take or had taken steps to make her home safe.

164. These representations were material to Plaintiff's decisions to remain in her home.

165. But for Defendants' false statements, Plaintiff would not have remained in her MacDill home.

166. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiff suffered emotional distress and economic harm, including out-of-pocket losses and the disputed move-out charges.

### COUNT XVIII: Omitted

### COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)

167. Plaintiff incorporates the allegations set forth in paragraphs 1–53.

168. Defendants, including through Harbor Bay, deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiff's housing in order to cause Plaintiff to remain in her MacDill home.

169. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiff a duty to disclose their knowledge of continuing hazardous and unsafe conditions in her home.

170. Additionally, Defendants had knowledge of the defects in the home or

were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiff and failed to do so.

171. As a few examples, Defendants falsely (a) represented, through a Harbor Bay representative identified as "Louis," that the soft and unstable upstairs flooring was "fine" and "normal in Florida" and that Ms. Patterson need only avoid "heavy furniture" or "jumping jacks" in the room, when the floor was in fact unstable and was never repaired; (b) represented, on August 28, 2025, that the recurring downstairs-bathroom water staining and mold were merely "excessive moisture from the AC duct"—the same cause identified in 2024—and that a remediation team would be sent, when no remediation followed; and (c) represented that repairs were being handled while telling Ms. Patterson on October 18, 22, and 25, 2024 that "all work was on hold," applying only ineffective containment that repeatedly failed, and performing cosmetic measures such as wiping visible mold from the kitchen range hood with a rag, rather than remediating the underlying conditions.

172. Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiff that repairs had been successfully completed.

173. Defendants knew that the concealed or omitted facts were material to Plaintiff's decision to remain in her home and should have been disclosed.

174. Defendants knew that their concealment or omission would induce the Plaintiff to act or refrain from acting.

175. Plaintiff relied on Defendants' concealments and omissions.

176. But for the Defendants' fraudulent concealments and material omissions, Plaintiff would not have remained in her MacDill home.

177. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff suffered emotional distress and economic harm, including out-of-pocket losses and the disputed move-out charges.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiff has sustained damages and is entitled to recover damages related to the following, including but not limited to:

a. Compensatory damages;

b. Restitution;

c. Out-of-pocket expenses;

d. Costs, expenses, pre-judgment and post-judgment interest, and fees, including attorneys' fees; and

e. Punitive damages.

## PRAYER FOR RELIEF

Plaintiff prays that this Court:

A. Award the Plaintiff compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII,

IX, XV, XVII, XIX, in an amount to be determined at trial;

C. Award the Plaintiff pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which she may be entitled by law, and;

D. Grant the Plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

DATED: August 7, 2026.                    Respectfully submitted,

*/s/ Robert J. McKee*
Robert J. McKee
Florida Bar No.: 972614
THE MCKEE LAW GROUP, LLC
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email: rmckee@themckeelawgroup.com
Lead Counsel

Vincent J. Colatriano*
Michael Weitzner*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: 202-220-9600
Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

Kristina Baehr*
Christopher LaCour*
JUST WELL LAW, PLLC
1809 Pearl Street
Austin, Texas 78701
Tel: (512) 693-8029
Email: Kristina@well.law
Email: Chris@well.law
Email: Militaryhousing-
lit_PLslistserv@well.law

*Pro Hac Vice forthcoming
Attorneys for Plaintiff

41